**HALL, Commissioner of Insurance and Banking, v. FIRST NAT. BANK OF JACKSONVILLE et al. (No. 2692½.)**

(Court of Civil Appeals of Texas. Texarkana. April 11, 1923. Rehearing Denied May 31, 1923.)

**1. States ⓒ⇒191(2)—Suit to establish claim against bank depositors' guaranty fund may be maintained without state's consent.**

A suit against the commissioner of insurance and banking to establish a rejected claim as a valid charge against the bank depositors' guaranty fund and against the assets in the hands of the commissioner is apparently provided for by Rev. St. arts. 463, 464, and may be maintained without the state's consent.

**2. Banks and banking ⓒ⇒320—Balance shown by clearing house certificate not "deposit" if intended to be paid at once in cash or exchange.**

A balance shown by a clearing house certificate, issued and accepted as evidencing a credit on the issuing bank's books against which the holder may draw, is a deposit within the protection of the Bank Deposit Guaranty Law (Rev. St. arts. 445–517); but if the parties' intention was that checks handled in the clearing house be offset against each other, and the balance paid at once in cash or by a draft on some other bank, the relation of depositor and depositee does not arise.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Deposit.]

**3. Banks and banking ⓒ⇒15—Any form of settlement releasing drawer of check is "payment" extinguishing deposit to such extent.**

While a bank deposit secured by the state guaranty fund remains secured until paid by the bank, payment need not be made in money, any form of settlement with holder of a check thereon which releases the drawer of the check, being a payment which extinguishes the deposit to such extent.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Payment.]

**4. Banks and banking ⓒ⇒139—"Check" may be revoked by drawer at any time before paid or otherwise accepted by bank.**

A check is a mere order from a depositor directing the bank to pay a specified sum of money to the holder and may be revoked by the drawer at any time before it is paid or in some manner accepted by the bank.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Check.]

**5. Banks and banking ⓒ⇒15—Holder of check not "depositor" of drawee bank unless he takes credit on its books.**

Since mere possession of a check confers no claim against the drawee bank nor any interest in the credit against which it is drawn, the holder cannot claim the rights of a depositor as to state guaranty fund without a subsequent agreement to such effect with the

bank, as by taking credit on its books as a depositor, instead of accepting payment in cash or commercial paper.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Depositor.]

**6. Banks and banking ⓒ⇒15—Bank accepting draft in settlement of clearing house balance held not entitled to protection of state guaranty fund; "depositor."**

A bank accepting a draft from another bank in settlement of a balance shown by a clearing house certificate issued on the same date, as was customary, *held* not a depositor of the drawer, and hence not entitled to recover the amount from the state guaranty fund after payment was refused by the bank on which it was drawn and the drawer became insolvent; such fund being for the protection of depositors, those who deposit money or its equivalent in a bank for safe-keeping, and not for noninterest-bearing, unsecured debts.

**7. Judgment ⓒ⇒248—Allowing claim against state guaranty fund and general assets of insolvent bank held erroneous as based on inconsistent pleadings.**

A judgment establishing a bank's demand for the amount of a dishonored draft issued in settlement of a clearing house balance by a bank, which subsequently became insolvent, as a valid claim against the state guaranty fund, and also making it a preferred claim against the insolvent bank's general assets in the hands of the banking commissioner, *held* erroneous as based on inconsistent counts alleging that payment of the draft was wrongfully refused by the bank on which it was drawn, and that it was paid and the funds wrongfully appropriated by drawee to payment of the drawer's note secured by collateral which drawee returned, the drawer being discharged from liability on the draft and as a depositee, if such, on payment of the draft, while if payment was refused there was no basis for a lien against the collateral, in view of Negotiable Instruments Act, § 127 (Vernon's Ann. Civ. St. Supp. 1922, art. 6001–127).

**8. Subrogation ⓒ⇒1—Persons by whom doctrine may be invoked stated.**

The doctrine of subrogation may be invoked by persons performing a legal duty arising by express agreement or operation of law, by one acting under the necessity of self-protection, and by persons acting directly or indirectly at the debtor's request or on the public's invitation, and whose payments are favored by public policy.

**9. Subrogation ⓒ⇒31(1)—Only creditor holding debt for payment of which security is pledged is entitled to subrogation to latter.**

No one is entitled to subrogation to a security who is not legally a creditor holding the debt for payment of which the security is pledged.

**10. Bills and notes ⓒ⇒499—Payment of draft not presumed from ambiguous indorsements thereon.**

Payment of a draft will not be presumed from ambiguous indorsements thereon.

**11. Subrogation ⊕=31 (2)—Payee of dishonored draft held not entitled to subrogation to drawee's lien on collateral securing note to satisfaction of which it applied credit on which draft was drawn.**

A bank accepting, in settlement of a clearing house balance, a draft drawn by another bank on a third bank, which refused payment and applied the credit, against which it was drawn, to the satisfaction of a note secured by collateral, which it returned to the drawer, *held* not a creditor by substitution and hence not entitled to subrogation to the lien on such collateral in the hands of the banking commissioner after the drawer's insolvency, whether drawee's application of the fund was made with or without payee's consent.

### On Motion for Rehearing.

**12. Banks and banking ⊕=15 — "Depositor" protected by guaranty fund defined.**

A depositor protected by the state guaranty fund is one who puts money or its equivalent in a bank and leaves it there for safe-keeping, the state guarantying that the bank will repay it on demand.

**13. Banks and banking ⊕=132—Deposit not "loan" to which implied promise to pay interest attaches.**

While depositing money for safe-keeping creates the relation of debtor and creditor between depositee and depositor, it is not an ordinary loan to which the law attaches an implied promise to pay interest, the depositor's compensation consisting in the security or safe-keeping of his funds.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Loan.]

**14. Assignments ⊕=49—Drawing check is not assignment of deposit.**

A deposit creates an obligation which may be assigned, and, when assigned, carries with it all the securities attending it; but the drawing of a check by a depositor is not an assignment of the deposit, though the holder, if the check is only accepted or certified on presentation, may occupy the attitude of an assignee of at least so much of the deposit as is embraced in the check, the deposit remaining intact until the check is paid or in some manner satisfied.

**15. Bills and notes ⊕=437 — Marking check "good," or "accepted," does not satisfy it or extinguish deposit.**

Simply marking a check "good," or writing "accepted" on it, does not satisfy it or extinguish the deposit against which it is drawn.

**16. Banks and banking ⊕=15 — Issuance of draft in settlement of clearing house balance held not acceptance or certification of checks presented for payment, and surrendered, canceled, and returned to drawers.**

Issuance of a clearing house certificate and payment of the balance shown thereon by a draft on another bank *held* not an acceptance or certification by the drawer of checks held against it by payee, and presented, not for acceptance or certification, but for payment, and surrendered, canceled, and returned to the drawers, thereby extinguishing the original deposits and releasing the accompanying claims against the state guaranty fund as security for their payment.

**17. Banks and banking ⊕=320 — "Clearing house certificate" in form of duebill payable on demand differs from "certificate of deposit," which negatives accrual of interest.**

A clearing house certificate in the form of an interest-bearing obligation or due bill, which is a legal equivalent of a promissory note, and being payable on demand, bears interest from its date, is essentially different from an ordinary certificate of deposit which merely certifies that a stated sum has been deposited and carries the implication that the money is held for safe-keeping without interest.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Certificate of Deposit; Personal Property.]

**18. Banks and banking ⊕=15—Bank having no deposit with bank issuing draft in settlement of clearing house balance does not become depositor.**

A bank having no account against which it might draw a check on another bank did not become a depositor of the latter on its issuance of a clearing house certificate, and hence could not recover from the state guaranty fund, after the drawer's insolvency, the amount of a dishonored draft issued in settlement of the balance shown by such certificate; the purpose of the clearing house proceedings being to ascertain and pay balances, not to make or carry deposits.

**19. Banks and banking ⊕=15—Depositor voluntarily converting deposit into interest-bearing obligation loses security of state guaranty fund.**

A depositor who voluntarily converts a deposit into an interest-bearing obligation loses the security furnished by the state guaranty fund and cannot recall it because of a default in payment of the new obligation.

Appeal from District Court, Cherokee County; L. D. Guinn, Judge.

Suit by the First National Bank of Jacksonville against Ed Hall, Commissioner of Insurance and Banking, and others. From a judgment against the named defendant, he appeals. Reversed and rendered.

W. A. Keeling, Atty. Gen., John W. Goodwin and Walace Hawkins, Asst. Attys. Gen., and Lee G. Carter, of Jacksonville, for appellant.

Norman, Shook & Gibson and Perkins & Perkins, all of Rusk, and Love, Wagner & Wagner, of Houston, for appellees.

HODGES, J. On January 1, 1921, and for some years prior thereto, the appellee the First National Bank of Jacksonville and the Farmers' Guaranty State Bank were private banking corporations doing business in Jacksonville, Tex. They were members of

---

⊕=For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

what is here called a "clearing house," a voluntary association of the three local banks at Jacksonville, through which they adjusted the daily differences resulting from the payment by one bank of checks drawn on another bank. In due course of business the appellee the First National Bank of Jacksonville cashed and acquired possession of a large number of checks drawn on the Farmers' Guaranty State Bank, and the latter had cashed and acquired a number of checks drawn on the appellee bank. On the morning of the date above mentioned representatives of these banks met in the usual manner for the purpose of "clearing" their balances. It was found that the appellee bank held checks for the sum of $3,851.02 against the Farmers' Guaranty State Bank in excess of the checks held by the latter against the appellee bank. In conformity with the custom the agent of the Farmers' Guaranty State Bank issued to the appellee what is called in the evidence a "clearing house certificate," which was as follows:

"Clearing House Certificate.

"$3,851.02.       •     Jan. 1, 1921.

"Due 1st National Bank $3,851.02 dollars. Payable on demand in current funds.

       "Farmers' Guaranty State Bank,

       "Kate Spraggin, Assistant Cashier.

"Jacksonville, Texas."

At the same time the agent issuing that certificate made the following duplicate:

(Yellow Duplicate.)

"$3,851.02      Clearing House Certificate.

                    "Jan. 1, 1921.

"Credit 1st National Bank 3,851.02 dollars, amount due them in clearings to-day.

       "Farmers' Guaranty State Bank,

       "Kate Spraggin, Assistant Cashier.

"Jacksonville, Texas."

The checks represented in that settlement were drawn by depositors whose claims were noninterest-bearing and unsecured. Among them, however, was a cashier's check for $2,195.76 issued some time previous by the Farmers' Guaranty State Bank to L. C. Tucker, a depositor. This check had been delivered by Tucker to an oil company, and by the latter presented to and paid by the appellee bank. Tucker was an ordinary depositor of the Farmers' Guaranty State Bank, and his deposits were noninterest-bearing and unsecured. The evidence does not show the aggregate value of the checks which entered into the settlement on the date above mentioned, nor does it show to whom any of the checks were issued, except the cashier's check held by Tucker. Some time later during the same day on which these balances were adjusted, in accordance with the prevailing local custom of paying such balance, the appellee bank applied for and received from the Farmers' Guaranty State Bank a draft for the amount of $3,-

851.02 upon the Houston National Exchange Bank. This draft was promptly forwarded to the Union National Bank of Houston, the appellee's correspondent at Houston, for collection. It was presented for payment on the 3d day of January, 1921, and payment refused by the Houston National Exchange Bank, and the draft was returned dishonored in the due course of business to appellee. At the time this draft was presented for payment, the Farmers' Guaranty State Bank had a credit on the books of the Houston National Exchange Bank amounting to $15,000. The Houston National Exchange Bank held the note of the Farmers' Guaranty State Bank for an equal sum, which was due on the 15th of the same month. The Houston National Exchange Bank also held collateral amounting to approximately $40,000 belonging to the Farmers' Guaranty State Bank, as security for the payment of that note. At or about the time the draft above referred to was presented to the Houston National Exchange Bank for payment the latter had apparently for some reason become uneasy about the solvency of the Farmers' Guaranty State Bank, and decided to apply the credit on its books to the payment of the note of the Farmers' Guaranty State Bank for $15,000, which it held. After thus balancing accounts, the collateral held by the Houston National Exchange Bank was returned. On the 4th of January, 1921, the doors of the Farmers' Guaranty State Bank were closed and its affairs taken over by the state banking department. In due course of time the appellee bank made out and presented to the commissioner of banking and insurance, as required by law, its claim against the insolvent bank. No question is made about the regularity of that claim upon the guaranty fund. The claim was rejected, and this suit followed, its purpose being to establish that claim as a valid charge against the depositors' guaranty fund and against the assets in the hand of the commissioner.

In the original petition filed by the appellee, Ed Hall, the commissioner of banking and insurance, W. J. Weatherby and S. J. Mings, members of the state banking board, the Farmers' Guaranty State Bank, and the Houston National Exchange Bank were made parties defendant.

In a trial before the court, judgment was rendered discharging all the defendants except Ed Hall, the commissioner of banking and insurance. Judgment was entered against him establishing the claim of the appellee as a valid charge against the depositors' guaranty fund, also classifying it as a preferred claim to be paid out of the assets belonging to the insolvent bank. From that judgment the commissioner, Ed Hall, has appealed.

[1] It is contended by the appellant that this suit is, in effect, one against the state, and for that reason it cannot be maintained

without the consent of the state. Articles 463 and 464 of the Revised Civil Statutes apparently provide for a suit of this character to establish the validity of a rejected claim against the state guaranty fund. Moreover, this question was indirectly, if not directly, involved in the recent case of Middlekauff v. State Banking Board, 111 Tex. 561, 242 S. W. 442, in which the Supreme Court recognized the right of a claimant to maintain this kind of a suit.

[2] The controlling question in the case is: Was the appellee a depositor of the Farmers' Guaranty State Bank within the meaning of chapter 5, title 14, of the Revised Civil Statutes, at the time the latter was closed by the act of the Commissioner? It appears from the evidence that all of the checks involved in this suit which passed through the clearing house at Jacksonville were drawn against funds on deposit in the Farmers' Guaranty State Bank, and their payment was secured by the state guaranty fund. If the appellee ever became a depositor of the insolvent bank it was when the clearing house representative of the latter accepted the checks drawn upon it and issued the certificate evidencing the balance due the appellee. Whether or not that transaction created the relation of depositor and depositee between the two banks depends upon the intention of the parties at that time. If the clearing house certificate was issued and accepted as evidencing a credit which was to be carried on the books of the Farmers' Guaranty State Bank, against which the appellee might draw, then this balance became a deposit within the meaning of the statute. But if it was the intention of the parties that the checks handled in the clearing house were to be offset one group against another, and the balance paid at once, either in cash or by a draft on some other bank, then the relation of depositor and depositee did not arise.

[3] The proposition that a deposit in a bank which is secured by the state guaranty fund remains secured till it is paid by the bank is correct. But that does not mean that payment must be made in money. When a check drawn against a deposit is presented for payment, it is either paid or some satisfactory agreement made for future payment, or payment is refused. The drawer of the check is released unless payment has been refused. Any form of settlement which releases the drawer of the check is a payment and operates to extinguish so much of the deposit against which it has been drawn as is represented by the face of the check.

[4, 5] Whether or not the payee, or holder of the check, becomes a depositor depends upon the nature of the transaction between him and the bank when the check is paid. A check is a mere order from a depositor directing the bank to pay a specified sum of money to the holder. It may be revoked by the drawer at any time before it is paid, or in some manner accepted, by the bank on which it is drawn. Since the mere possession of a check confers upon the holder no claim against the bank on which it is drawn, nor interest in the credit against which it is drawn, he cannot claim any of the rights of a depositor without a subsequent agreement to that effect with the depositor bank. He may accept payment of his check in cash, or in some form of commercial paper, or he may take credit on the books of the bank as a depositor. In any event, if he becomes a depositor, it results, not from the fact that he held and presented a check drawn against a deposit, but from the fact that he made a deposit, the check being treated as the equivalent of so much money.

[6] We are of the opinion that the facts of this case show that when the clearings were made on the 1st day of January, 1921, the appellee had no intention of taking credit on the books of the Farmers' Guaranty State Bank as a depositor. Its own witnesses testified that it was the custom among the Jacksonville banks to settle clearing house balances with exchange. One of them testified as follows:

"The banks of Jacksonville have a clearing house system. A representative of each bank will meet at one of the banks of the town with a list of checks each holds, and they will make lists of the checks each bank held against the other banks, and they would compare the lists, and each representative check out of the bank he represented, and if he had more checks on one of the other banks than that bank had against him, he would give or take exchange covering the difference, and then he turned to the other bank and would go through the same procedure. For the difference thus ascertained a charge ticket is issued and signed by the representative of the bank, and later on the bank holding the ticket would take it to the bank issuing the same and surrender a [the] receipt and take exchange for it. Yes; the instrument shown me is the kind of receipt issued."

The clearing house certificate previously quoted was then identified by the witness as the form of the receipt referred to. Kate Spraggins, the representative who issued that clearing house certificate, testified as follows:

"The custom with reference to issuing clearing house certificates was this: There were three banks in town, and each sent a representative to the other bank at 10 o'clock. We would meet at one bank one month and at another bank another month, and the third bank the next month; and each representative would take two lists of his checks, and would give me the amount of his on his list, and I gave him the amount of mine, and if he had more than I, I would give him a certificate for this amount. * * * That was the custom among the banks. We use these certificates all the time and still use them. The certificate for $3,851.02 was issued by me to the First National Bank (the appellee) and that bank brought it to the cash-

ier for the Farmers' Guaranty State Bank and received exchange for it. That was the customary way of transacting this business."

The draft accepted by the appellee in settlement of the balance shown on that occasion bore the same date as the certificate. There is no evidence in the record in conflict with that quoted, nor are there any circumstances which tend to show that the draft on the Houston bank was not accepted in payment of the balance ascertained in the clearing house proceedings.

Appellee relies on the case of Middlekauff v. State Banking Board, previously referred to, as decisive of the question here presented. In that case a depositor drew his check against his deposit for the sum of $3,000, and took from his bank a cashier's check drawn on the same bank; he merely exchanged his own check for the cashier's check to be used as a convenience while traveling. His deposit had not been withdrawn. As supporting the conclusion that the acceptance of the cashier's check was not a payment which extinguished the deposit, the Supreme Court quoted with approval the following:

"A bill given for and on account of money due on a simple contract operates as a conditional payment which may be repudiated at the option of the creditor if the bill be unpaid at maturity in his hands, in which case he may rescind the transaction of payment and sue on the original contract."

The rule here stated is not available in this case, because the appellee was never a depositor of the bank which issued the dishonored draft. If the draft had been accepted by the payee as a conditional payment of its own check drawn against its own deposit, the situation would be materially different. But the draft was accepted as conditional payment of a balance which was not a deposit, but an unsettled claim or account. If the appellee should repudiate the draft and reclaim its original status, it would still be no more than a simple creditor. The Farmers' Guaranty State Bank had never given any credit on its book against which the appellee might draw its checks as a depositor, nor was the appellee entitled to claim any such credit.

The state's guaranty fund is for the protection of depositors only, those who deposit money, or its equivalent, in a bank for safekeeping, and not for every noninterest-bearing, unsecured debt. Commonwealth v. American Trust Co., 241 Pa. 153, 88 Atl. 430.

[7] The appellee insists that, if it be denied the rights of a depositor, the judgment should nevertheless be affirmed on the other ground —that it held an equitable lien against the collateral which passed from the Houston National Exchange Bank into the hands of the commissioner of insurance and banking when the latter took charge of the assets of the Farmers' Guaranty State Bank. In the judgment rendered, the trial court, not only established the demand of the appellee as a valid claim against the state guaranty fund, but also made it a preferred claim against the general assets of the insolvent bank. This latter provision of the judgment was based upon the conclusion that the draft drawn on the Houston National Exchange Bank had in legal effect been paid, but that the funds used for that purpose had been diverted to the satisfaction of the note held by the Houston National Exchange Bank against the Farmers' Guaranty State Bank, and that such misappropriation entitled the appellee to subrogation to the lien on the collateral formerly held by the Houston bank.

It is apparent that these two features of the judgment rest upon inconsistent pleadings and also upon conflicting conclusions regarding the facts disclosed by the evidence. In the first count of the appellee's petition, in which it seeks to establish its demand as a valid claim against the depositors' guaranty fund, it is alleged that the draft was accepted by it in good faith, promptly presented for payment, and payment wrongfully refused. In another count, which is the basis of the suit against the Houston National Exchange Bank, it is alleged that the draft was paid, but that the funds used for that purpose, and which should have been transmitted to the appellee, were wrongfully appropriated by the Houston National Exchange Bank to the payment of the unmatured note it held against the Farmers' Guaranty State Bank. If the draft was in legal effect paid when presented to the drawee, that fact legally discharged the drawer the Farmers' Guaranty State Bank, from any further liability on the draft, and also extinguished its liability as a depositee, if it ever had occupied that relation towards the appellee. On the other hand, if payment of the draft was refused as alleged, and the conditions upon which the appellee had accepted the draft in satisfaction of its alleged deposit had failed, then there was no legal basis for a lien against the collateral held by the Houston National Exchange Bank. It is expressly provided in section 127 of the Negotiable Instruments statute (see Acts of 1919, c. 123 [Vernon's Ann. Civ. St. Supp. 1922, arts. 6001—127]) that the drawing of a bill of exchange does not operate as an assignment of the funds in the hands of the drawee available for the payment of the bill, and that the drawee is not liable on the bill until and unless he accepted the same. The evidence bearing upon the issue of payment is, in substance, as follows:

The draft involved in this suit was drawn on Saturday, January 1, 1921. On Monday, January 3, it was received by the Union National Bank of Houston, to whom it had been sent for collection. The banks at Houston

had a clearing house association for the adjustment of their balances. Presumably this draft was presented by the Union National Bank in the clearing house on January 3 as a claim against the Houston National Exchange Bank, and the balances adjusted by the usual credits made in such transactions. The draft for $3,851.02 bears the following indorsement: "Paid through Houston clearing house Jan. 3, 1921." Over that indorsement appears another: "Indorsement erased after office hours." No other explanation of what took place in the Houston clearing house proceedings, or when that erasure was made, or what occurred between the collecting bank and the drawee in the draft, appears in the record.

Th appellee seeks to bring this case within the rule applied in National Union Bank v. Earle (C. C.) 93 Fed. 330. In that case a Philadelphia bank owed the National Union Bank of New York City $21,145.43. In payment of that indebtedness, it issued its draft in favor of the New York bank on the National Bank of the Republic in New York City, with which it had a drawing account. The draft was transmitted to the National Union Bank and by it presented for payment through the clearing house. It was paid by entering the credits common in such proceedings. Some time later the National Bank of the Republic learned unofficially that the Philadelphia bank, the drawer of the draft, had failed, and in order to protect itself against legal complications requested the National Union Bank to refund the amount paid, with the understanding that the balances would be subsequently adjusted by agreement. That was assented to by the National Union Bank, who later demanded the payment of the amount specified in the draft. This was refused by the National Bank of the Republic, and that sum, together with the balance which it owed the Philadelphia bank, was transmitted to and passed into the hands of the receiver who had taken charge of the Philadelphia bank. Suit was then filed by the National Union Bank of New York against the receiver to recover that amount as a preferred claim against the assets of the Philadelphia bank. The court held that the claim was entitled to priority of payments out of the assets of the insolvent Philadelphia bank, based upon the ground, presumably, that the funds which the National Bank of the Republic had transmitted to the receiver belonged to the National Union Bank of New York.

This controversy discloses a different state of facts. In this case, the funds to which the appellee asserts title by virtue of the Houston clearing house transaction were never transmitted to the banking commissioner in charge of the insolvent Jacksonville bank, but were applied by the Houston National Exchange Bank to its own use, or, it may be

252 S.W.—53

claimed, in part to the satisfaction of the note held by it against the Farmer's Guaranty State Bank. The equitable lien asserted against the collateral held by the Houston National Exchange Bank, and which it did later transmit to the commissioner, must rest upon the assumption that such a lien arose by subrogation when funds belonging to the appellee were appropriated to the payment of a debt secured by that collateral. The proposition assumes that the draft had actually been paid; that the funds then in the hands of the Houston National Exchange Bank had been placed to the credit of the appellee; that those funds were later and without the consent of the appellee applied to the extinguishment of the unmatured note held by the Houston National Exchange Bank against the Farmers' Guaranty State Bank of Jacksonville.

[8, 9] The doctrine of subrogation rests upon an equitable principle which may be invoked by three classes of individuals: (1) Those who act in the performance of a legal duty arising either by express agreement or by operation of law. (2) Those who act under the necessity of self-protection. (3) Those who act at the request of the debtor directly or indirectly, or upon invitation of the public, and whose payments are favored by public policy. 2 Pomeroy, Equity Jurisprudence, § 921. The appellee does not come within any one of these classes. Its funds were not applied to the payment of the note because of any legal duty growing out of its consent, or arising by operation of law, nor were they so applied for its protection. Appellee did not act at the request of the debtor, nor was the application of the funds made in furtherance of any matter of public policy. No one is entitled to subrogation to a security who cannot legally claim the attitude of a creditor holding the debt for the payment of which the security is pledged. In order to justify a recourse on the collateral held by the Houston National Exchange Bank, the appellee had first to occupy the attitude of a creditor holding the whole, or a part, of the very debt' which that collateral secured. That collateral cannot be applied to the payment of an obligation for which it was not pledged. Let us assume in this instance that no insolvency had supervened, that the Farmers' Guaranty State Bank was still a going concern after the transaction in the Houston clearing house; could the appellee, under the facts of this case, claim the status of a creditor by substitution? Its funds, if any it then had in the hands of the Houston National Exchange Bank, were applied by the latter either with or without the consent of the appellee. If applied with its consent, the payment was voluntary and created no rights. 2 Pomeroy on Equity, § 920. If made without its consent, then the wrongdoer, the Houston National Exchange Bank, was primarily liable

for the misappropriation. If that bank had a legal right to act as it did in applying the credit standing on its books in favor of the Farmers' Guaranty State Bank to the payment of the latter's unmatured note, then there was no infringement of the appellee's rights; no funds belonging, to it had been used.

[10] There is no evidence that any credit was ever entered upon the books of the Houston National Exchange Bank in favor of the Union National Bank of Houston, which handled the draft for collection. The erasure of the clearing house indorsement which in-, dicated payment shows that payment was not, in fact, made, and in the absence of an actual payment one will not be presumed from ambiguous indorsements on the instrument. The making of that indorsement amounted to no more than if it had been made on a separate piece of paper.

[11] By rendering the judgment exonerating the Houston National Exchange Bank from liability, the court in effect concluded that the latter bank had acted within its rights and had not wrongfully applied any funds belonging to the appellee to the payment of the note of the Farmers' Guaranty State Bank. It is inconceivable that the Houston National Exchange Bank could be exonerated upon any other finding.

The case is clearly distinguishable from the cases relied on by the appellee in other respects not necessary here to discuss.

Our conclusion is that the judgment of the trial court is without support in the evidence, if not in the pleading; and the judgment will therefore be reversed, and judgment here rendered in favor of the appellant.

### On Motion for Rehearing.

The following provisions of our Negotiable Instruments Law, enacted in 1919 (Vernon's Ann. Civ. St. Supp. 1922, arts. 6001—1 to 6001—197), should be considered in determining the rights of the appellee in this controversy:

"Sec. 185. A check is a bill of exchange drawn on a bank, payable on demand. Except as herein otherwise provided, the provisions of this act applicable to a bill of exchange payable on demand apply to a check."

"Sec. 188. Where the holder of a check procures it to be accepted or certified the drawer and all indorsers are discharged from liability thereon.

"Sec. 189. A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder, unless and until it accepts or certifies the check."

Vernon's Ann. Civ. St. Supp. 1922, arts. 6001—185, 6001—188, 6001—189.

Section 132 (article 6001—132) relating to bills of exchange, contains this provision:

"The acceptance must be in writing and signed by the drawee."

[12, 13] A depositor who is protected by the state's guaranty fund is one who puts money, or its equivalent in a bank and leaves it there for safe-keeping. The state guarantees that the bank will repay that sum upon demand. The bank is expected to use the money so deposited in its business, but it must be at all times prepared to make the repayment when demanded. The compensation of the depositor is furnished in the security, or safe-keeping, of his funds, which the bank supplies in becoming a depository. While depositing money for safe-keeping creates the relation of debtor and creditor between the depositee and the depositor, it is not an ordinary loan to which the law attaches an implied promise to pay interest.

[14, 15] In the elaborate argument presented in the motion for rehearing filed by counsel for the appellee much emphasis is placed upon the legal right of a depositor to assign his deposit without losing the protection of the state's guaranty. It is insisted that the holding in this case is tantamount to a denial of that right. No such ruling is intended; for unquestionably a deposit creates an obligation which may be assigned, and when assigned carries with it all the security attending the original deposit. But the drawing of a check by a depositor is not an assignment of the deposit, or any part of it. If the check when presented is not paid, but only accepted, or certified, the holder might then occupy the attitude of an assignee of the deposit, or so much of it as is embraced in the check. Until the check is paid, or in some manner satisfied, the deposit remains intact. Simply marking a check "good," or writing on it "accepted," does not satisfy the check, or extinguish the deposit against which the check is drawn. Girard Bank v. Bank of Penn Township, 39 Pa. 92, 80 Am. Dec. 507.

[16, 17] It is contended that the clearing house transaction heretofore referred to was in legal effect an acceptance, or certification, by the Farmers' Guaranty State Bank of the checks held against it by the appellee. But the facts do not justify that conclusion. The appellee did not present those checks for acceptance, or certification, but for payment. They were surrendered, canceled, and returned to the drawers. That transaction extinguished the original deposits and released the accompanying claim against the state's guaranty fund as security for their payment. We then come to this question: Did the appellee then become a depositor? The evidence of the attitude assumed by the appellee, after the clearings were made is furnished by the clearing house certificate, which appears in full in the original opinion. That instrument is essentially different from an ordinary certificate of deposit. When a bank receives money for deposit, it merely certifies that a stated sum has been deposited, and that kind of certificate carries the implica-

tion that the money is held for safe-keeping, and that no interest will accrue because of the use made of it by the bank. The clearing house certificate issued in this instance is in the form of an interest-bearing obligation—a duebill, a legal equivalent of a promissory note. Hopson v. Brunwankel, 24 Tex. 607, 76 Am. Dec. 124; Barnard v. Moseley, 28 Tex. 543; 1 Daniel on Negotiable Instruments (5th Ed.) §§ 39, 40; Kimball v. Huntington, 10 Wend. (N. Y.) 675, 25 Am. Dec. 590; Marrigan v. Page, 4 Humph. (Tenn.) 247; Jacquin v. Warren, 40 Ill. 459. See, also, cases cited in 7 Am. Dig. (Cent. Ed.) col. 92, § 61. Being payable on demand, the obligation was due at once, and bore the legal rate of interest from its date. Henry v. Roe, 83 Tex. 446, 18 S. W. 806; O'Neal v. Magner, 81 Cal. 631, 22 Pac. 876, 15 Am. St. Rep. 88.

[18] However, the form of the instrument might be ignored if the transaction out of which it grew indicated a different intent; but such is not the case. The clearing house proceedings were for the purpose of ascertaining and paying balances, not to make and carry deposits. If the parties had gone no further than to issue this duebill, or certificate, the appellee could not claim the attitude of a depositor, for the reason that it had left nothing in the Farmers' Guaranty State Bank for safe-keeping. It held no account against which it might draw a check. True, the appellee was a creditor, but not a depositing creditor.

[19] But even if the appellee had at any time occupied the attitude of a depositor, it could, if it saw fit, abandon that attitude and assume the character of a different kind of creditor. If a depositor voluntarily converts a deposit into an interest-bearing obligation, he loses the security furnished by the state guaranty fund, and having once lost that security in that manner he cannot recall it because of default in the payment of the new obligation. That proposition is sustained by the opinion of the present Chief Justice rendered while Attorney General. See Report of Opinions of Attorney General, 1914–1916. It is also in harmony with the holding of the Supreme Court of Pennsylvania in the cases previously cited in the original opinion.

The motion for rehearing is overruled.