CHAPMAN et al. v. SOUTHWEST NAT. BANK OF DALLAS. (No. 235.)*

(Court of Civil Appeals of Texas. Waco. June 18, 1925. Rehearing Denied Oct. 8, 1925.)

1. Banks and banking ⬤⟞15—Instrument authorizing bank to deposit with another bank noninterest-bearing, unsecured deposit held not to create any liability against depositors' guaranty fund.

Instrument of banking commissioner, authorizing national bank to deposit with another bank a noninterest-bearing, unsecured deposit, *held* not to create any liability against depositors' guaranty fund, since such liability can arise only by virtue of statutes as applied to facts of particular case.

2. Banks and banking ⬤⟞15—Bank held not to have made a "noninterest-bearing, unsecured deposit" in another bank by giving it credit on its overdrawn account.

National bank which, on authority of banking commissioner to deposit a noninterest-bearing, unsecured deposit in another bank, took $30,000 of its own money and paid itself $30,000 on a $45,000 overdraft it then held against such other bank, *held* not to have made a deposit of a "noninterest-bearing, unsecured de-

---

⬤⟞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error refused November 25, 1925.

posit" of $30,000 in such bank, within meaning of Rev. St. art. 486.

**3. Banks and banking ⟐⟐15—Bank cannot become "depositor" in another bank by giving it credit on overdrawn account.**

While a bank, as well as a private individual, may become a depositor in another bank, it cannot become a "depositor" in another bank, within Rev. St. art. 486, by giving it credit on overdrawn account.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Depositor.]

**4. Banks and banking ⟐⟐15—All creditors of bank are not necessarily depositors.**

While all general depositors of a bank are creditors thereof, all creditors are not necessarily depositors within Rev. St. art. 486.

**5. Banks and banking ⟐⟐15—Any attempt to change relation of creditor towards guaranty fund will be treated as fraud thereon, where insolvency of bank has already fixed status of creditors.**

Where insolvency and contemplated insolvency of bank, in view of Rev. St. art. 551, had already fixed status of creditors thereof as to which funds they could look to for payment, any attempt by bank making a deposit therein, under authority of banking commissioner to change relation of creditor towards guaranty fund, came too late, and will be treated as a fraud on that fund and therefore void.

**6. Banks and banking ⟐⟐15—Bank's deposit not entitled to protection of guaranty fund, where indebtedness created thereby expressly secured by deed of trust on real estate.**

Bank making deposit in another bank, under authority of banking commissioner to make a noninterest-bearing, unsecured deposit, *held* not entitled to protection of guaranty fund, in view of Rev. St. art. 486, where indebtedness created by such deposit was expressly secured by deed of trust by depositee bank on real estate.

Appeal from District Court, Johnson County; Irwin T. Ward, Judge.

Action by the Southwest National Bank of Dallas against J. L. Chapman and others. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

W. A. Keeling, Atty. Gen., Jno. W. Goodwin, Asst. Atty. Gen., and Heber Henry, of Cleburne, for appellants.

R. L. Stennis and Bailey, Nickels & Bailey, all of Dallas, and B. Gayle Prestridge, of Cleburne, for appellee.

### Statement.

STANFORD, J. This suit was instituted by appellee, the Southwest National Bank of Dallas, against J. L. Chapman, banking commissioner of Texas, and the state banking board, composed of W. A. Keeling, Attorney General, C. V. Terrell, state treasurer, and J. L. Chapman, banking commissioner. As grounds for recovery, appellee alleged, in substance:

That the Guaranty State Bank of Cleburne was incorporated under the laws of Texas as a state bank, and elected to operate under the depositors' guaranty fund plan. That on the morning of the 4th day of April, 1923, the said J. L. Chapman, the then acting commissioner of insurance and banking, and as representative of the state banking board, caused to be delivered to appellee the following instrument, to wit:

"Austin, Texas, 4/3/1923.

"Southwest National Bank, Dallas, Texas: This will be your authority to deposit with the Guaranty State Bank of Cleburne, for thirty days from date, a noninterest-bearing and unsecured deposit of approximately $30,-000.00, and such deposit will be protected by the guaranty fund of the state of Texas.

"J. L. Chapman,

"Commissioner of Insurance and Banking."

That at the time of the delivery of said letter, the Guaranty State Bank of Cleburne maintained an account with appellee as its general reserve agent. That, relying upon said letter of J. L. Chapman and the terms thereof, appellee did, on the morning of April 4, 1923, deposit to the account of the Guaranty State Bank of Cleburne, $30,000, and at once notified said bank by telephone that said sum had been deposited to its credit, and that said Guaranty State Bank then and there fully approved of said deposit and accepted same, and that said deposit thereby became its property, etc. That after business hours on April 4, 1923, appellants took charge of the Guaranty State Bank of Cleburne, and are administering said bank, claiming that it is insolvent, and that they are liquidating it. That, in due time and in the proper manner, appellee presented its claim as payable out of the guaranty fund, to the commissioner of insurance and banking, and that said commissioner has failed and refused to pay said claim; that by reason of the premises, appellee is entitled to recover from appellants and to receive from the guaranty fund, $30,000, said sum having been deposited in the Guaranty State Bank of Cleburne as a noninterest-bearing, unsecured deposit, upon the promise and guaranty that it would be repaid in 30 days. Appellee prayed for judgment against appellants and the guaranty state fund for $30,000, and for an order requiring appellants to pay same out of said fund.

Appellants answered by demurrers, exceptions, and general denial. The case was tried before the court without a jury, and resulted in a judgment against appellants for $30,000, and establishing same as payable out of the guaranty fund. Other facts will be stated in connection with our disposition of appellants' assignments.

---

⟐⟐For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Opinion.

As we view this case, there is only one question raised necessary to be considered, to wit: Did appellee, in good faith and within the intention of article 486, Revised Statutes, deposit in the Guaranty State Bank of Cleburne a noninterest-bearing, unsecured deposit of $30,000? However, as leading up to the main question involved, we will discuss briefly the alleged contract with the commissioner of banking.

[1] We do not think the written instrument of April 3, 1923, created in any way a legal liability on the part of the commissioner, or the banking board, to repay said $30,000 out of the depositors' guaranty fund. We do not think the banking board or the commissioner had authority to make a contract that would create such liability against the depositors' guaranty fund. Such liability could arise only by virtue of the provisions of our statutes as applied to the facts of the particular case. American State Bank v. Wilson, 110 Kan. 520, 204 P. 709. And we do not understand that the commissioner or the banking board intended said instrument as such a contract. What he stated in said written instrument was only a repetition of the law as applicable to the facts therein stated. If appellee, in good faith and within the intention of article 486, had made a noninterest-bearing, unsecured deposit of $30,000 in the Guaranty State Bank of Cleburne, it would have been protected by the guaranty fund for said amount, not by reason of what the commissioner with the approval of the banking board, said in this written instrument of April 3d, but solely by reason of the provisions of our guaranty law providing that such deposits shall be protected. Said instrument of April 3, 1923, could not create any liability as a contract, and neither could it operate as an estoppel to create liability against the depositors' guaranty fund. See American State Bank v. Wilson, 110 Kan. 520, 204 P. 709.

The record discloses: That on and prior to April 3, 1923, appellee, the Southwest National Bank of Dallas, was the approved reserve agent of the Guaranty State Bank of Cleburne, herein referred to as the Cleburne bank, and that on said date, April 3, 1923, the account of the Cleburne bank with the appellee was overdrawn about $45,000, and, in addition to this $45,000 overdraft, the appellee had rediscounted notes for the Cleburne bank to the amount of $21,586.30, which notes were past due and unpaid, making a total indebtedness of $67,586.30 to appellee. That on or about April 1 or 2, 1923, one of the assistant bank examiners had examined the Cleburne bank and found it in a failing condition. That said assistant banking commissioner and also some of the officers and stockholders of both the Cleburne bank and appellee were trying to devise some plan, apparently, to save the Cleburne bank from insolvency.

That, in an effort to get such relief, Mr. J. W. Wright, who lived at Dallas and who was a director and stockholder in the Cleburne bank, and the Honorable Cullen F. Thomas, an attorney for the Cleburne bank, who was also a stockholder and director in appellee bank, went to Austin to confer with the commissioner of banking, and that said parties, together with the commissioner of banking and his assistants, did work on the proposition all of the day of April 3, 1923, and until about 11:30 p. m. of said date, and that said parties, at the depot at said late hour, after J. W. Wright had told the commissioner the Cleburne bank could not open the next morning unless it had help, reached an agreement, resulting in the written instrument of April 3, 1923, addressed to the appellee bank. That during said day, April 3d, drafts and checks drawn by the Cleburne bank on appellee bank were presented for payment, coming through other banks in Dallas, amounting in the aggregate to $10,680, and they were accepted by appellee bank as paid, with the understanding, however, such acceptances could be withdrawn by 9 o'clock the next morning.

The officials of the appellee bank, during the day of April 3d, knew said conference was being had in Austin with the commissioner of banking, and kept in touch with the progress being made, and, if relief was obtained for the Cleburne bank, the acceptance of said checks and drafts was to stand, otherwise to be retracted by 9 o'clock a. m. April 4, 1923. At the time the commissioner of banking delivered the instrument to Mr. Thomas, of date April 3d, addressed to appellee bank, he told Mr. Thomas to tell the Southwest National Bank of Dallas that this money was for the purpose of giving the Cleburne bank funds to operate on, and to take care of new business; that under no condition was appellee to mingle said fund with any other fund or transaction which appellee might have on its books with the Cleburne bank; that it must be kept in a separate deposit. Mr. Wright or Mr. Thomas, at said late hour on April 3d, communicated with the appellee bank to the effect that they had succeeded in getting relief, etc., and to meet them the next morning early at the Southwest National Bank.

About 8:30 o'clock on April 4th, Mr. Wiley Blair, president, and S. W. Sibley, vice president of appellee bank, met Mr. Thomas at said bank. Mr. Thomas delivered the written instrument of April 3d, addressed to appellee, to Mr. Wiley Blair, the president, but the evidence tends to show he did not deliver the oral instruction as to how said $30,000 was to be used, but it is evident appellee knew it was to be used for the benefit of the Cleburne bank to keep it a going concern. On the delivery of the written instrument of April 3d, Mr. Blair had said $30,000 credited to the general account of the Cleburne bank— that is, the $30,000 was first credited as a special account to the Cleburne bank, and at

the same time and on the same page said special account was charged with $30,000, and a credit of $30,000 given to the general account of the Cleburne bank—and the vice president of appellee, Sibley, phoned the banks holding the checks and drafts which had been conditionally accepted the day before, amounting to $10,680, and confirmed their payment. He also phoned the Cleburne bank, informing said bank its account had been credited with $30,000. In addition to this $30,000 deposited early in the morning of April 4, 1923, the Cleburne bank, on said day, made two remittances to appellee bank, one for $30,702.58 and another for $8,034.74, which also were credited to the general account of the Cleburne bank, making a total of $68,737.32 credited to the general account of the Cleburne bank on the books of appellee bank, which wiped out the overdraft of $45,000 and the $10,680 drafts and checks paid for the Cleburne bank on April 3d and 4th, and left a balance to the credit of the Cleburne bank of $21,592.30. At about 3:30 p. m. on said 4th day of April, 1923, the banking commissioner, through a deputy, took charge of the Guaranty State Bank of Cleburne and immediately wired other banks with which said Cleburne bank did business, including appellee. Appellee, on said 4th day of April, at about 5 p. m., after it had received notice of the closing of said Cleburne bank, applied $21,586.30 of the amount it had on hand to the credit of the Cleburne bank, to what it claimed said Cleburne bank owed it for certain notes it had rediscounted for the Cleburne bank, which left a balance on hand to the credit of the Cleburne bank of $6. Thus, the net result of the entire transaction was to enable appellee to pay itself all it claimed was due it from the Cleburne bank except $30,000, and to place this, as it supposed, under the protection of the depositors' guaranty fund of the state of Texas.

This brings us to the real question necessary to be considered, which is, Did appellee, in good faith and within the purview of the state bank guaranty law, make a noninterest-bearing, unsecured deposit of $30,000 in the Guaranty State Bank of Cleburne? If it did, regardless of what agreement it may have had with the commissioner of banking, or whether or not it had any agreement at all, it would be entitled to the protection of the depositors' guaranty fund. This is the plain provision of our statutes. In addition to the facts above stated, the record discloses that on April 2d to 4th, inclusive, appellee knew the Cleburne bank was insolvent. S. W. Sibley, vice president of appellee bank, testified:

"I was informed by the bank examiner Wallace, about April 1 or 2, 1923, that the condition of the Guaranty State Bank of Cleburne was critical."

Wiley Blair, president of appellee bank, testified, in substance, that he knew about the bank examiner examining the Guaranty State Bank of Cleburne, April 2, 1923, and knew about J. W. Wright and Cullen F. Thomas going to Austin to see the commissioner of banking relative to the condition of the Cleburne bank and to ascertain what disposition would be made by the commissioner relative to the report of the bank examiner. On April 2, 1923, the Cleburne bank executed a deed of trust on certain real estate in Cleburne to appellee bank to secure any and all indebtedness of every kind of the Cleburne bank to appellee bank. Dan D. Rogers, vice president of appellee bank, testified, in substance, that he had heard on April 1 to 3, 1923, that the Cleburne bank had suffered quite a shrinkage in deposits, and that J. W. Wright and Cullen F. Thomas had gone to Austin to see the commissioner to see what disposition would be made by him of the bank's affairs, etc.

Was appellee, as to this $30,000, under the circumstances, a depositor, within the intent and meaning of the guaranty fund law? As said in the case of Tyler County State Bank et al. v. Seaboard State Bank & Trust Co. (Tex. Civ. App.) 257 S. W. 951:

"To create a 'deposit,' within the meaning of the statute (article 486, R. S.) money or the equivalent of money must, in intention and effect, be placed in or at the command of the bank, the title to which passes from the depositor to the bank, and for which the depositor is entitled to credit upon the bank's books as a cash deposit, and creates the relation of creditor and debtor between the depositor and the bank. Tyler County State Bank et al. v. J. W, Rhodes (Tex. Civ. App.) 256 S. W. 947; Kidder v. Hall [113 Tex. 49] 251 S. W. 497, 499; Hall v. Bank (Tex. Civ. App.) 252 S. W. 828; Bank v. Bank, 84 Tex. 40, 19 S. W. 334; Lankford v. Schroeder, 47 Okl. 279, 147 P. 1049, L. R. A. 1915F, 626."

Or, as said by our Supreme Court in Kidder v. Hall, supra:

"A depositor is one who delivers to or leaves with a bank money, or checks or drafts, the commercial equivalent of money, subject to his order, and by virtue of which action the title to the money passes to the bank."

See, also, Turkey State Bank v. Estelline State Bank (Tex. Com. App.) 272 S. W. 775, not yet officially reported; State Banking Board et al. v. Pilcher (Tex. Com. App.) 270 S. W. 1004.

[2, 3] Did appellee bank in this case deliver to or leave with the Cleburne bank any money or commercial paper equivalent to money, subject to its (the Dallas bank's) check? Did the title to the $30,000 pass to the Cleburne bank? The appellee bank took $30,000 of its own money and paid itself $30,000 on a $45,000 overdraft it then held against the Cleburne bank. Appellee deposited no money, nor the equivalent of money, in the Cleburne bank, and the money the appellee bank deposited with itself for the Cleburne bank, it had spent—applied on its own debt against

the Cleburne bank—before it notified the Cleburne bank that such deposit had been made. It is true a bank, as well as a private individual, may become a depositor in another bank. Elmira Savings Bank v. Davis, 73 Hun, 357, 26 N. Y. S. 200. But a bank cannot become a depositor in another bank by the depositing bank giving credit on its own books to the overdrawn account of the depositee bank. Savings Bank v. Foster, 118 Mich. 268, 76 N. W. 499, 42 L. R. A. 404; State Banking Board et al. v. James et al. (Tex. Civ. App.) 264 S. W. 145; Nichols v. State, 46 Neb. 715, 65 N. W. 774; Hansen v. Kirtley, 11 Iowa, 565; Poucher v. Scott, 98 N. Y. 422; Ellis v. State, 138 Wis. 513, 119 N. W. 1110, 20 L. R. A. (N. S.) 444, 131 Am. St. Rep. 1022. As said in the case of State Banking Board v. James, above cited, in which a writ of error was refused:

"To create a 'deposit' within the meaning of the statute (article 486, R. S.), money, or the equivalent of money, must, in intention and effect, be placed in or at the command of the bank, the title to which passes from the depositor to the bank, and for which the depositor is entitled to credit upon the bank's books as a cash deposit, and creates the relation of creditor and debtor between the depositor and the bank. Kidder v. Hall [113 Tex. 49] 251 S. W. 497."

See State v. Farmers' State Bank (Neb.) 199 N. W. 812.

[4] The undisputed evidence shows that appellee did not place any money or the equivalent of money, in or at the command of the Cleburne bank. The undisputed evidence shows that by the transaction involved the title to no money, or its equivalent, passed to the Cleburne bank. There is no evidence that from the transaction involved appellee was entitled to any credit upon the books of the Cleburne bank for a cash deposit of any amount. The evidence is conclusive that the transaction involved did not create the relation of creditor and debtor between appellee and the Cleburne bank. Said transaction neither increased nor diminished the indebtedness of the Cleburne bank to appellee. The only supposed effect was to change $30,000 of the overdraft of the Cleburne bank into a deposit for said amount, protected by the depositors' guaranty fund, and this without a dollar passing from one bank to the other. In fact, it was only a matter of book entries. On the morning of April 4, 1923, the general overdraft account of the Cleburne bank on the books of appellee was $45,000. No one could contend this overdraft was secured by the guaranty fund. Suppose appellee had decided to deposit $45,000 with the Cleburne bank, as it did in this case—and it could have done it just as easily as $30,000 for it was just like taking money out of one pocket and putting it in the other—and it had credited in a special account $45,000 to the Cleburne bank and immediately charged this special account with $45,000, and credited the general overdrawn account of the Cleburne bank with $45,000, thus wiping out the overdraft, could it be contended with any degree of plausibility that an unsecured overdraft could thus, just by a few strokes of the pen, be converted into a noninterest-bearing, unsecured deposit, protected by the guaranty fund? Could the Legislature have intended that such result might thus be accomplished? We think not. The law deals with the substance of things. As said by our Supreme Court in Kidder v. Hall, 113 Tex. 58, 251 S. W. 499:

"The law will look through all semblances and forms to ascertain the actual fact as to whether or not there has been a bona fide deposit made, and, if not, the guaranty fund does not protect the transaction, no matter how it may be evidenced."

While all general depositors of a bank are creditors of said bank, all creditors are not necessarily depositors. Banking Board v. James (Tex. Civ. App.) 264 S. W. 145; Hall v. First Nat. Bank (Tex. Civ. App.) 252 S. W. 828.

[5] Appellee was the correspondent or approved reserve agent of the Cleburne bank. In their various transactions, overdrafts had arisen in favor of appellee against the Cleburne bank, and on April 3 and 4, 1923, this overdraft was $45,000. The Cleburne bank was insolvent, and appellee knew it was so. It was virtually in the hands of the commissioner of banking. One of the vice presidents of appellee said that he knew on April 3, 1923, that the condition of the Cleburne bank was critical. Another vice president of appellee said that on April 3, 1923, they were just waiting to see what the commissioner would do with reference to the Cleburne bank, that the Cleburne bank was insolvent. See Commonwealth v. Traders' Trust Co., 237 Pa. 316, 85 A. 363; Turkey State Bank v. Estelline State Bank (Tex. Com. App.) 272 S. W. 775, not yet officially reported. The Cleburne bank being insolvent on April 2, 3, and 4, 1923, and appellee knowing of such insolvency the attempt of the officers of appellee to change the form of its indebtedness against the Cleburne bank from an interest-bearing overdraft, unprotected by the guaranty fund, to a noninterest-bearing, unsecured deposit, protected by the guaranty fund, came too late. The insolvency and contemplated insolvency of the Cleburne bank had already fixed the status of the creditors of said bank as to which fund they could look to for payment, and any attempt to change the relation of the creditor toward the guaranty fund came too late, and must be treated as a fraud on that fund, and therefore void. State Banking Board v. Pilcher (Tex. Com. App.) 270 S. W. 1004; Hill, County Treasurer, v. Kavanaugh, 118 Ark. 134, 176 S. W. 336, 4 A. L. R. 1. Besides, the financial

condition of the Cleburne bank on April 3 and 4, 1923, taken in connection with the contemplated' insolvency, under the provisions of article 551, Revised Statutes, made the relation of appellee toward the Cleburne bank as a creditor the same as though the Cleburne bank had been already taken in charge by the commissioner of banking. See State Banking Board et al. v. Pilcher (Tex. Com. App.) 270 S. W. 1004. As above stated, appellee credited the general overdraft account of the Cleburne bank of $45,000 with $30,000, and notified the Cleburne bank that it had done so. This had the effect of reducing said overdraft $30,000, but did not have the effect of depositing any money in the Cleburne bank. But appellee contends this overdraft was covered by other remittances from the Cleburne bank. It is true there were two remittances from the Cleburne bank, to wit, $30,702.58 and $8,034.74, received on the same date and credited to the general account of the Cleburne bank upon the books of appellee, but, according to a statement made from the books of appellee, these two remittances were received and credited to the general overdraft account after the $30,000 was credited and entirely absorbed by the overdraft, and still leaving an overdraft of $15,000.

The evidence in the record shows the $30,000 was credited on the general overdrawn account about 9 a. m. April 4, and Mr. Sibley testified the $30,702.58 and the $8,034.74 was sent by a special messenger from the Cleburne bank to the Dallas bank about 2:30 p. m. April 4th. The fact is, on April 4, 1923, the total deposits in appellee bank, including the $30,000, amounted to $68,737.32, and all of it except $6 was applied by appellee to the indebtedness of the Cleburne bank to appellee bank. Not a dollar of it went into the Cleburne bank, or into the possession of the commissioner of banking after he took charge of the Cleburne bank, and there is no evidence that appellee bank would have extended additional credit to the Cleburne bank to keep it a going concern. At the time S. W. Sibley, vice president of appellee, phoned the Cleburne bank that the $30,000 had been deposited to the credit of the Cleburne bank, he did not tell the Cleburne bank that said money, or any part of it, was subject to the order of the Cleburne bank. He did inquire if the Cleburne bank needed any currency, and, if so, he would send it over, but there was no indication how much he would send. The evidence tends to show from the entire transaction that it was really the appellee bank that sought aid from the commissioner of insurance, under the guise of helping the Cleburne bank, but in reality to collect or make secure appellee's indebtedness against the Cleburne bank. Some of the stockholders and directors of the Cleburne bank were also stockholders and directors of the appellee bank.

As stated above, the net result of the entire transaction was not to make a noninterest-bearing, unsecured deposit in the Cleburne bank, or any other kind of a deposit, but to enable appellee to collect all of its indebtedness against the Cleburne bank except the $30,000, and, as appellee supposed, to put this under the protection of the guaranty fund.

[6] There is another fact in this case that shows conclusively appellee is not entitled to the protection of the guaranty fund, to wit: On April 2, 1923, the Guaranty State Bank of Cleburne executed a deed of trust on real estate in Cleburne to R. L. Stennis, trustee, for Southwest National Bank of Dallas. This deed of trust recites that it is given "for the purpose of securing any and all debts, liabilities, guaranties, demands, and obligations whatsoever, due or to become due from the Guaranty State Bank of Cleburne to the Southwest National Bank of Dallas, and, when same are fully discharged, then this conveyance shall become null and void," etc. This deed of trust was filed for record April 4, 1923, at 8:30 p. m., and was duly recorded in volume 97, p. 84, Deed of Trust Records of Johnson county, Tex. If appellee deposited the $30,000 in the Cleburne bank, as it contends it did, then the Cleburne bank became indebted to appellee for said amount and said indebtedness was and is expressly secured by the terms of said deed of trust on real estate above referred to, and said indebtedness, being thus secured, could not be protected by the depositors' guaranty fund. Rev. Statutes, art. 486; Austin v. Bank (Tex. Civ. App.) 205 S. W. 839.

As we view the transaction involved here, appellee was not in any event entitled to recover. We sustain appellants' assignments raising the questions herein discussed, and reverse and render judgment in appellants' favor, and that appellee take nothing, and disallowing appellee's claim as a claim protected by the depositors' guaranty fund. All costs are adjudged against appellee.

### On Rehearing.

In motion for rehearing, appellees contend that the deposit it claims to have made with the Guaranty State Bank of Cleburne on April 4th was excepted from the blanket mortgage given by the Cleburne bank to the Dallas bank on April 2d, to secure any and all forms of indebtedness of the Cleburne bank to the Dallas bank, and say:

"The simple and conclusive answer to that is that the $30,000 was deposited with the distinct agreement that it was not secured, and that agreement, of course, excluded it from the mortgage."

There is no evidence in the record that there was any agreement between the Dallas bank and the Cleburne bank to the effect

that the $30,000 deposit was not secured, or that it was excepted from the blanket mortgage.

Appellees' motion is overruled.